## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Major Andrew Dudt, U.S. Army
CMR 480 Box 782
APO AE 09128
Germany

Case No.: 22-2431

Plaintiff,

COMPLAINT FOR VACATING OF
UNLAWFUL AGENCY DECISION
UNDER THE ADMINISTRATIVE
PROCEDURE ACT

v.

The Honorable Christine E. Wormuth
Secretary of the Army
US Army
101 Army Pentagon
Washington, DC 20310-0101

Defendant.

## COMPLAINT FOR VACATING OF UNLAWFUL AGENCY DECISION UNDER THE ADMINISTRATIVE PROCEDURE ACT

Major Andrew Dudt, U.S. Army ("Plaintiff") was a First Lieutenant when he attended the

Defense Intelligence Agency ("DIA")'s Advanced Source Operations Course ("ASOC") at Fort

Huachuca in 2010. While there, he noticed some extremely troubling practices, including grave

breaches of information security when it came to the use of classified information, as well as a

lack of formalized standards for the assessment of students. His concerns were dismissed out of

hand by ASOC leadership. By November 18, 2010, he had satisfactorily performed almost the

entirety of the course and was on his final day. On that day, he was stunningly informed that he

was being dismissed, following a "murder board" convened to assess the students. This board

had zero written procedures, standards, or record, and it's clear that the decision to dismiss him

was contentious and a result of Plaintiff's voicing his concerns as detailed herein. In addition, he was dismissed despite having never been given any sign that he was struggling, and in violation of the binding guidance controlling the course, which mandated academic probation and retraining for test failures. He was issued a fundamentally defective evaluation form showing that he had completely failed the course, devoid of the review by senior Army leadership required by Army regulation for such adverse reports.

Subsequent investigations by the DIA Investigator General ("DIA IG") confirmed many of his suspicions. In particular, the DIA IG found that there were massive classified information security breaches at ASOC, and even went so far as to perform an Intelligence Oversight Investigation, a major step within the intelligence organization. The DIA IG recommended changes completely in line with Plaintiff's complaints during the course as to classified U.S. Government information protections and security procedures. Inexplicably, the DIA IG's investigation into Plaintiff's complaints and dismissal, would take another two years after that. Even so, the DIA IG's investigation still substantiated essentially all of Plaintiff's complaints as to course procedure, and recommended changes which again aligned with the issues Plaintiff had raised. Despite this, the DIA IG decided that Plaintiff's complaints as to his own treatment during the course had been somehow unsubstantiated.

Plaintiff first applied to the ABCMR for correction of his Form DA 1059 in 2016. He filed for reconsideration in 2019, with the decision in his matter, AR20190012413, being the agency decision in controversy in his matter. The ABCMR made many troubling errors in its denial of his request for relief.

First, it violated its own regulations by clearly applying the heightened "clear and convincing" evidentiary standard, despite its regulations stating that the standard of evidence for overcoming the presumption of regularity was a preponderance of the evidence.

Second, it failed to address, or explain why it was not addressing, the arguments Plaintiff had raised. Instead, it put forward a perfunctory boilerplate response that the evidentiary standard had not been met. This was particularly egregious, given that Plaintiff had clearly raised how the adverse assessment given to him had violated both Army regulation and the binding guidance governing the course.

For these reasons, this Court should find the ABCMR's decision in AR20190012413 arbitrary, capricious, and contrary to law, under the Administrative Procedure Act, and vacate its findings. In addition, given the clear regulatory breaches which have occurred, it should direct the ABCMR to correct Plaintiff's records as requested, to show that he had in fact satisfactorily completed the course.

Finally, given the systemic issue raised in this case regarding the applicable standard of evidentiary review, the Court should order the ABCMR to demonstrate whether it has applied the clear and convincing standard of evidentiary proof in other matters before it, and for how long it has been doing so.

### JURISDICTION AND VENUE

1. This court has jurisdiction pursuant to 28 U.S.C. § 1331, as this is a civil action arising under the laws of the United States, namely the Administrative Procedure Act.

2. Venue in this district is proper pursuant to 28 U.S.C. § 1391(e)(1) and 5 U.S.C. § 703.

### THE PARTIES

3. Plaintiff, Major Andrew Dudt, U.S. Army is currently serving as a Field Grade Officer in the rank of Major in the U.S. Army.

4. Defendant, the Honorable Christine Wormuth, is being named in her official capacity as the Secretary of the Army, which oversees the Army Board for the Correction of Military Records.

## FACTUAL ALLEGATIONS

**The Advanced Source Operations Course ("ASOC")**

5. ASOC is a three month-long course given at Fort Huachuca, Arizona, and falls under the umbrella of a Defense Intelligence Agency ("DIA") entity, the Human Intelligence Training - Joint Center of Excellence ("HT-JCOE").

6. The course itself is administered by the U.S. Army Intelligence Center, and assessment of course results is done by Army personnel, and the completion form for the course is on a Department of the Army Form 1059 ("DA Form 1059").

7. The course has since been renamed the Defense Advance Tradecraft Course ("DATC").

8. Students in the course are competitively selected from an applicant pool, and are selected based on experience, training, and future utility.

9. Students must act at all times as if they were in a foreign country. The course is primarily composed of practical exercises and report writing interspersed with very minimal one-on-one instruction and classroom lectures.

10. Evaluated events generally take the form of high-level role-playing scenarios in various urban and rural environments, primarily meetings with role players which include planning and operational considerations, administration and report writing, and support to tactical military operations.

11. They also include a loosely administered series of room invasions, law enforcement stops, and questioning.

12. Performance at each practical exercise is evaluated under approximately half a dozen areas, and students are given one of three colors in each area for each exercise: red (no go), amber (marginal go), and green (go).

13. The total number of red/amber/green scorings per student for the whole course numbers into the hundreds.

14. ASOC is governed by the Student Evaluation Plan ("SEP") and Course Handbook, with the SEP controlling ASOC at the time Plaintiff was at the program having been implemented on

August 20th, 2010. *See* Exhibit X2, HT-JCOE ASOC Student Evaluation Plan dated July 16th, 2010.

15. Per ASOC's Student Evaluation Plan, if a student receives too many reds in a given area across all exercises, it is ASOC's duty to officially inform the student, place him on official Academic Probation, provide re-training, and provide re-testing before there is any consideration of course dismissal. *Id.* at ¶¶ 3(b), (c).

16. There are no written tests. Grades are instead documented as one of the above three colors via one green sheet per exercise, which is a one-to-two-page classified assessment assembled by the instructor who ran the exercise and shown to the student during a post-exercise critique, but never shown or given to the student subsequently.

17. Students are explicitly told not to contest the merits of the grade given to them and, in general, are counseled to be thick-skinned and to accept criticism.

18. The course is divided into a number of phases, with each focusing on a particular set of human intelligence ("HUMINT") techniques applied in varying environments.

19. The course culminates in a final practical exercise called the "test phase" where all the skills taught over the course are theoretically tested and are similarly assessed via green sheets.

20. Due to the lack of written standards and vague nature of the assessments, the green sheet evaluations are highly subjective and assessment standards are largely left to each instructor.

21. This is heightened by the explicit weight placed on students not to contest the merits of any assessment.

22. Evaluation is also conducted via three closed-door and undocumented panels commonly referred to as "murder boards" where the instructors convene to determine whether to retain or dismiss students.

**Plaintiff's participation in ASOC in 2010.**

23. Plaintiff, then a First Lieutenant, was a member of the ASOC class conducted from August 21, 2010, through November 19, 2010.

24.  Plaintiff noticed substantial troubling security breaches, including the use of ASOC unclassified computer systems and thumb drives, as well as public websites, to process classified HUMINT information and reports, a grave violation of Department of Defense and Army information security regulations.

25. When he raised these concerns in early September of 2010 they were dismissed with the instructors even claiming that they had an exception granted which permitted the use of unclassified thumb drives.

26. Plaintiff would raise these concerns, among other criticisms of ASOC, via what he thought was secure email, though he later discovered from a classmate that ASOC had installed key-logging software on the class-provided computers. These were the only computers students were permitted to use, allowing them to monitor all communications.

27. Upon learning this, Plaintiff took steps to protect his personal information.

28. Plaintiff voiced other concerns directly to ASOC cadre, including the security violation issues, issues with the fundamental redundancy of the ASOC course with other courses, the repressive environment, and the way his classmates were treated.

29. By November 18, 2010, the day before the end of the course, Plaintiff had satisfactorily completed all of the course requirements and was facing his third murder board.

30. While clearing out his computer account and doing other closeout tasks, an instructor came up to him and indicated her intent to change one of his prior green sheets from green (pass) to red (fail) for no stated reason, despite the instructor and Plaintiff having already signed it.

31. This was highly suspicious, but Plaintiff acquiesced, due to the heavy pressure placed on student compliance by the course.

32. A few hours later, Plaintiff was informed in a close-door counseling session, comprised of course leadership and an alternate instructor from his operational management team (not his lead instructor who was in another State) that he was being dismissed from the course because he failed to meet course standards.

33. This was allegedly based on his failure in two room intrusion exercises.

34. He had been informed as to his failure in the first, though never told why or given counseling or additional instruction how to fix his alleged deficiencies during it.

35. The decision was clearly contentious and not unanimous, but he was asked to sign a DA Form 1059 reflecting that he:

    a. Had failed to achieve course standards (Box 11);
    b. Had unsatisfactorily demonstrated all five evaluated abilities (Box 12);
    c. Had not demonstrated the academic potential for selection to higher level schooling/training (Box 13). Exhibit X3, Plaintiff's DA Form 1059.

36. The commentary supporting the adverse finding was that he had been relieved for poor operational suitability and judgment but was eligible to return to ASOC.

37. Unusually, and contrary to regulation, Plaintiff and the then ASOC director, Lon Castleton immediately signed the form (Army Regulation requires the reviewed party to sign *last* only after the intermediate and senior reviewer have signed the form), and, even worse, the senior reviewing officer, HT-JCOE Acting Commander LTC Matthew Wallace, never signed the form.

38. This was a major breach of Army regulations concerning academic evaluations.

39. Later that day, Plainitff raised several points in rebuttal, namely:

   a. ASOC's academic standards and guidance were so vague as to create no clear enforceable standard, and removing him under such vague measures should be invalidated;

   b. ASOC did not apply practical exercises to all students, and the room intrusions he had been removed for were not only applied to students during different chronological portions of the course, but were not even applied to some students at all;

   c. Contrary to the SEP, he was never given the required opportunity for retraining on the room intrusion exercise prior to retesting, nor had he ever been placed on Academic Probation prior;

   d. Dismissal based on an isolated failure of a practical exercise was unfair, given the unfair application of the exercise, in violation of joint training standards, and his overall satisfactory performance at ASOC. Exhibit X4, Plaintiff's Rebuttal of Dismissal dated November 18, 2010.

40. During the post-murder board counseling session, Plaintiff raised point B and C, and the board attempted to defend the decision on the grounds that the room intrusion exercise had actually been a retest, despite the earlier exercise being of a completely different nature and having occurred over a month prior.

41. Plaintiff noted that the second room intrusion could not have been considered a "retest", given that he received zero feedback or retraining, despite other students during this final phase of the course being called by members of the leadership cadre and given tips and retraining when it was perceived that they were underperforming – being in violation of the course's stated procedures for this phase which mandated that no instructor to student contact outside of the exercises themselves.

42. Following the course, Plaintiff notified his Army Reserve chain of command, up to and including the O-6 level, as to his concerns about the course, including both the major information security failures and the questionable circumstances of his dismissal.

43. When his command failed to officially intervene on his behalf, he filed a complaint with the Department of Defense Inspector General Hotline in November of 2010.

44. His complaint was split into two separate investigations, one into the security breaches, the other as to his dismissal from the course, with the latter inexplicably taking nearly three years to perform.

**The First DIA Investigation as to Security Breaches at ASOC, DIA IG 2011-500040.**

45. Following Plaintiff's call to the DoDIG hotline in November of 2010, DoDIG, through the DIA IG, conducted a substantial investigation of the ASOC program, which confirmed Plaintiff's allegations, and the underlying complaints he had raised to ASOC leadership.

46. Following a Staff Assistance Visit at ASOC from August 2nd through 17th, 2011, DIA IG 2011-500040 found that ASOC had been improperly using unclassified laptops with unauthorized encrypted software, resulting in classified documents being created on unclassified computers in unclassified environments. Exhibit X5, DIA IG FOIA Release at 19 (DIA IG 2011-500040 at 18).

47. In addition, the DIA IG confirmed Plaintiff's complaints as to the use of unclassified thumb drives and, despite ASOC leadership's claims to Plaintiff, DIA IG confirmed that ASOC had not received permission to do so. *Id.*

48. The DIA IG also confirmed that eight of the ten documents provided by Plaintiff to them had been misclassified by ASOC. Exhibit X5 at 18 (DIA IG 2011-500040 at 17).

49. The scale of the security breaches ongoing at ASOC were so great as to result in an Intelligence Oversight investigation, which is a major step taken when there has been potentially severe breaches of the statutes, regulations, guidance, or principles governing intelligence agencies and actions. Exhibit X5 at 22 (DIA IG 2011-500040 at 21).

50. In short, Plaintiff had been right about the ASOC security breaches all along.

51. The same leadership staff which had sat in judgment as to his ability to maintain security, had also not only fostered a climate of major security breaches, but had also shot down Plaintiff when he had raised these major breaches to them.

**The Second DIA Investigation as to Plaintiff's complaints about his treatment and evaluation at the course, DIA IG 2013-400001.**

52. The second part of Plaintiff's complaint to the DoDIG, concerning course evaluation methods and his treatment at the course, was bifurcated into a separate DIA investigation, which inexplicably took two years to complete, being finished in 2013.

53. This investigation itself was later bifurcated as a whistleblower reprisal investigation.

54. This reprisal investigation supposedly found the charges unsubstantiated and was closed without any explanation, with no report ever being submitted to Plaintiff as required by 10 U.S.C. § 1034(e)(1).

55. It appears that Plaintiff's name became known to HT-JCOE during the course of the investigation, despite his specific requests to the DoDIG that they withhold his name under the Privacy Act.

56. On paper, DIA IG 2013-400001 found that Plaintiff's complaints were unsubstantiated.

57. This is despite the DIA IG report actually confirming a majority of Plaintiff's allegations.

58. For example, the report specifically found that room intrusion tests were applied unevenly to the students, including as to when in the participant's training they were applied, how often they were applied, and if they were even applied at all. Exhibit X5 at 44, DIA IG 2013-400001 at 43.

59. Plaintiff had been dismissed primarily based on a test not even given to some ASOC students at all. *See id.*

60. In addition, the DIA IG found that the murder boards lacked any written procedure or evaluation standards. *Id.* at 41, DIA IG 2013-400001 at 41.

61. The end result of these findings were recommendations by the DIA IG for standardization of student assessments and for the implementation of written procedures and evaluation metrics for the murder boards, both of which would have prevented what had happened to Plaintiff from occurring. Exhibit X5 at 44, DIA IG 2013-400001 at 43.

62. Despite its ostensible finding that Plaintiff's complaints were unwarranted, the DIA still recommended a large series of changes to ASOC evaluation methods which aligned with Plaintiff's complaints.

**The ABCMR's Decision on Reconsideration in AR20190012413.**

63. Plaintiff first applied to the ABCMR on August 15, 2016, which resulted in AR20160018054, which the Board denied.

64. Plaintiff applied to the ABCMR for reconsideration of AR20160018054 in 2019.

65. He requested that his DA Form 1059, dated November 18, 2010, be corrected in the following manner:

    a. Changing Block 11 to show that he achieved course standards;
    b. Changing Block 12(a)-(e) to show that all demonstrated abilities be changed to satisfactory;
    c. Changing Block 13 to show that academic potential for selection to higher level schooling/training be changed to "yes";
    d. Removing all adverse comments from Block 14;

in addition, he requested:

    e. A post-dated graduation certificate from HT-JCOE for ASOC;
    f. Correction of his HT-JCOE records to reflect that he passed the course;
    g. Removal of all adverse documentation related to his ASOC dismissal from his OMPF;
    h. Correction of all related Army records to show that he satisfactorily completed the course.

66. In support of his application, he argued that ASOC administrators had arbitrarily and selectively administered the room intrusion exercises, and that ASOC had violated binding Army regulations in dismissing him from the course.

67. Namely that:

    a. ASOC leadership had violated the binding guidance of the SEP through failing to put him on academic probation and by failing to provide retraining prior to retesting; and

    b. Had violated Army Regulation when it came to the procedure of issuing adverse educational assessments by failing to have the senior reviewing officer actually review and sign the form, as required, and by having Plaintiff sign the form first, which violated the procedures put in place to ensure proper review of the adverse findings before they were permanently entered into a service member's files;

    c. In addition, Plaintiff raised the factual inaccuracy of the adverse findings against him, inaccuracies which would have been prevented had the findings been given the proper review, as described above, as required by Army regulation.

68. The ABCMR denied his reconsideration application in AR20190012413, with the decision being dated June 11, 2021. Exhibit X1, AR20190012413.

69. The decision demonstrated several massive failings.

70. First, the decision appeared to have been made on the heightened "clear and convincing evidence" standard of proof, rather than the "preponderance of the evidence" standard required by Army regulation. Exhibit X1 at 11.

71. Second, the decision completely ignored Plaintiff's arguments as to both the selective application of the room intrusion exercises (substantiated by the findings of the DIA IG) and the major regulatory failures involved in the lack of proper, and mandated, review of Plaintiff's DA Form 1059. *Id.*

72. Instead, the decision appeared to be made exclusively on the basis of an alleged showing of poor judgment and lack of sound decision making, evidenced by a claimed 17 incidences. *See* Exhibit X1 at 5-6.

73. This ignored the fact that students would receive 80-100 green sheets over the course, and those 17 sheets included mostly Amber, not Red sheets.

74. These claims cannot be substantiated or responded to, as Plaintiff's green sheets, containing the alleged incidences, are classified, according to HT-JCOE.

75. It is unclear if this was actually the ABCMR's determination, as this was merely findings from an advisory opinion, and the ABCMR showed no indication that they adopted the advisory opinion's findings. Exhibit X1 at 11.

76. Rather, the ABCMR only gave a cursory statement that the preponderance of the evidence did not support relief. This itself is a misstatement, given that the ABCMR had erroneously applied the "clear and convincing" standard. *Id.*

77. Even if the ABCMR had adopted the advisory opinion's findings, which it did not say it did, the advisory opinion was still in clear contradiction to the SEP's standards, given that, had Plaintiff actually had been struggling so badly, he should have been put in probation. Exhibit X2 at ¶3(b).

78. The fact that he was not, and that in fact he had been rated as satisfactorily performing through up until the day before the end of the course, clearly points to the fact that, though he had made errors, ASOC had used them as a fig-leaf to retroactively justify their decision. *See* Exhibit X1 at 5-6.

79. In short, the stated reason for his dismissal remained solely based on his second failure in the room intrusion/"knock and talk" exercise, for which he had never been retrained after the first failure.

**CLAIMS**

**Claim I: The ABCMR's decision must be vacated under the Administrative Procedure Act as not in accordance with law as it violated its own governing regulation, 32 C.F.R. § 581.3, by applying the heightened "clear and convincing evidence" standard of proof, instead of the "preponderance of the evidence" standard required by regulation.**

80. The Administrative Procedure Act holds as unlawful all agency decisions which are not in accordance with law and requires that they be set aside. 5 U.S.C. § 706(2)(A).

81. In *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954) the Supreme Court mandated that agencies must follow their own regulations and binding guidance.

82. In AR20190012413, the ABCMR stated that Plaintiff had to meet the "clear and convincing" evidentiary standard of proof in order to overcome the presumption of administrative regularity. Exhibit X1, AR20190012413 at 11, 13.

83. However, 32 C.F.R. § 581.3(e)(iv)(2), the ABCMR's governing regulation, makes it clear that the standard of proof for overcoming the presumption of administrative regularity before the ABCMR is the "preponderance of the evidence" standard. *See also Poole v. Harvey*, 571 F. Supp. 2d 120, 125 (D.D.C. 2008) (confirming that the burden of proof for overcoming the presumption of administrative regularity before the ABCMR is the preponderance of the evidence standard).

84. The preponderance of the evidence standard holds that an applicant must show that it is slightly more likely (50%+1) than not that an error or injustice occurred. *See Ramirez v. United States Immigration & Customs Enforcement*, 471 F. Supp. 3d 88, 99 (D.D.C. 2020)

85. By contrast, the ABCMR defined the "clear and convincing" standard it applied as evidence of a "strong and compelling nature." Exhibit X1 at 11, 13.

86. While the ABCMR claimed to have made its decision on the preponderance of the evidence standard, it is clear that it applied the "clear and convincing" evidentiary standard, given that it specifically stated:

> "In order to justify deletion or amendment of a report, the appellant will produce evidence that establishes clearly and convincingly that the presumption of regularity will not be applied to the report under consideration." Exhibit X1 at 11.

87. "Clear and convincing" evidence is a significantly higher burden of proof than the 50%+1 of "preponderance of the evidence", sitting in between preponderance and the criminal standard of beyond a reasonable doubt. *See, e.g., Thomas v. Nicholson*, 423 F.3d 1279, 1284 (Fed. Cir. 2005):

> "It is true that Congress has established specific, heightened evidentiary standards for other determinations in veterans cases in 38 U.S.C. §§ 1111 and 1154(b). In

those sections, Congress provided that certain decisions adverse to claimants must meet the *heightened thresholds* of either "clear and unmistakable evidence" or *"clear and convincing evidence."* (Emphasis added).

88. The ABCMR cannot claim that the clear and convincing evidence standard stems independently from the presumption of administrative regularity, given that the regulation, and case law, clearly establishes that this presumption merely places the burden of proof on the Plaintiff, with the standard to overcome this burden being explicitly the "preponderance of the evidence standard." *See* 32 C.F.R. § 581.3(e)(iv)(2); *see Poole*, 571 F. Supp. 2d at 125.

89. The ABCMR thus violated its governing regulation through adjudicating Plaintiff's application under an unlawfully heightened burden of proof, as compared to the lower burden of proof mandated by its own governing regulation. *See id.*; *compare* Exhibit X1 at 11, 13.

90.  The mere recitation that it determined the decision based on a preponderance of the evidence cannot rescue the decision from the ABCMR's own clear statement that Plaintiff had to meet the "clear and convincing" evidentiary standard. *See* Exhibit X1 at 11, 13.

91. Given that the ABCMR violated its own governing regulation in the decision, AR20190012413 must be set aside under 5 U.S.C. § 706(2)(A) as not in accordance with the law.

92. Troublingly, while the ABCMR was open as to its application of the "clear and convincing" standard of evidence in this matter, it is likely that this unlawfully heightened standard of proof has been either silently or openly used by the ABCMR in many, if not all, of the more than ten thousand applications it receives per year.

93. The ABCMR should thus inform the Court as to whether it has used the "clear and convincing" heightened evidentiary standard as its burden of proof as a standard practice, and for how long it has been doing so.

 **Claim II: The ABCMR's decision must be vacated under the Administrative Procedure Act as arbitrary and capricious because it failed to address non-frivolous arguments raised by the Plaintiff, or to explain why it was not addressing them.**

94. In his application for reconsideration, Plaintiff raised the following arguments in favor of his application:

  a. That his dismissal from the course was an injustice because ASOC instructors arbitrarily and selectively administered room intrusion exercises (the sole stated basis for his dismissal) to Plaintiff, while not doing so to other students, which was confirmed by the Investigator General report; and

  b. That ASOC violated its own binding guidance and regulations by:

    i. Never placing Plaintiff on academic probation prior to dismissal or providing retraining for the allegedly deficient areas for which he was dismissed, both required by the ASOC Student Evaluation Plan; and

    ii. By having Plaintiff sign his DA Form 1059 before his reviewing or rating officer, and never having his reviewing officer sign the DA Form 1059, both violating the due process requirements of Army Regulation ("AR") (2007) 623-3 ¶¶ 3-37(f)(6) and 4-2, which ensure proper compliance oversight and mandatory review prior to holding that a student failed a course.

    iii. By failing to convene an Army Officer Board prior to providing him with an Academic Evaluation Report which held that he had failed the course in violation of AR 623-3 ¶X.

95. Each of these arguments raised facially non frivolous grounds for a finding that there was substantial injustice and legal error in the manner in which he had been dismissed from the course with a failing grade.

96. The ABCMR did not address any of the arguments raised in its decision, instead giving a single sentence boilerplate answer that, based on a preponderance of the evidence (actually under the clear and convincing evidentiary standard, as established above) the DA 1059 form in controversy was not in error or unjust. Exhibit X1 at 11.

97. An ABCMR decision which does not either address, or explain why the Board is not addressing, facially non frivolous arguments raised by an applicant is inherently arbitrary and capricious. *See, Rudo v. Geren*, 818 F. Supp. 2d 17, 26-7 (D.D.C 2011) (vacating ABCMR decision as arbitrary and capricious).

98. Whether a claim is frivolous is determined as to whether it is frivolous on its face. *See Calloway v. Brownlee*, 366 F. Supp. 2d 43, 55 (D.D.C. 2005).

99. The ABCMR refused to address any of the arguments raised by the Plaintiff, instead giving a single sentence boilerplate answer.

100. The ABCMR's decision in AR20190012413 must thus be set aside under the Administrative Procedure Act as arbitrary and capricious. *See Rudo*, 818 F. Supp. 2d at 26-7; *see* 5 U.S.C. § 706(2)(A).

**Claim III: The ABCMR's refusal to correct the DA Form 1059 must be vacated as not in accordance with the law, as the dismissal of Plaintiff from the course directly violated the due process requirements imposed by binding Army Regulation.**

101.    As stated above, under *Accardi*, an agency must follow its own binding regulations and guidance. *See, Accardi*, 347 U.S. 260 *et seq.*

102.    AR 623-3 (2007) at ¶ 3-37(f)(6) mandates that the rater sign an Academic Evaluation Report, then the reviewer, and finally the soldier themselves ("The rated Soldier may not sign or date the report before any other rating official.")

103.    AR 623-3 (2007) ¶ 2-18 makes the purpose behind this policy clear, as the rater and reviewer are tasked with ensuring that all narrative portions of the AER are correct, including derogatory information.

104.    AR 623-3 (2007) ¶ 2-18(c)(6) reinforces this by mandating that all relief reports or failure to achieve academic or course standards be reviewed by the first Army officer in the chain of command who is senior to the individual directing relief.

105.    A form stating that a soldier failed course standards constitutes severely derogatory information within that soldier's records, information with impacts which can follow the Soldier for the rest of their career.

106.    The procedures established by AR 623-3 (2007) at ¶¶ 2-18 and 3-37 thus establish critical procedural protections for soldiers, by ensuring that, first, any negative report is fully reviewed by someone above the person issuing the report, and, second, that any soldier cannot be pressed to sign a report until the information within it has been reviewed and confirmed by a senior officer.

107.    Plaintiff was denied this due process protection by being forced to sign the DA 1059 before it had been properly reviewed by a senior officer.

108.    In fact, the report was never reviewed by a senior officer, in this case LTC Matthew A. Wallace, as evidenced by the fact that there is no signature from a reviewer on it. *See* Exhibit X3.

109.    Nor was an officer board ever convened to review the adverse AER, despite it being required by AR 623-3 (2007) ¶X.

110.    Strongly adverse and derogatory information was thus placed into Plaintiff's file without Plaintiff ever having received the proper process meant to ensure that such information was merited. *See id.*

111.    Given that the procedures required to issue a finding of failure to achieve academic or course standards was not followed, in violation of Army Regulation, the adverse or derogatory information within the DA Form 1059 must be removed. AR 623-3 (2007) ¶¶ 2-18(c)(6), 3-37(f)(6).

112.    This requires postdated changes to: Block 11, to a finding that he achieved course standards, Block 12(a)-(e), to show that all demonstrated abilities were satisfactory, and Block 13, to show that he had potential for selection to higher level schooling/training.

113.    In addition, given that the process for finding that he had failed the course were not followed, not to mention that this occurred on the day before the course ended, Plaintiff must be found to have satisfactorily completed the course, must be granted a graduation certificate from HT-JCOE, and his records should be corrected to show his satisfactory completion of the course.

114.    Finally, any derogatory or adverse document concerning his ASOC dismissal must be purged from his file.

115.    The ABCMR's refusal to do the above, and to instead uphold the DA Form 1059, must thus be set aside under 5 U.S.C. § 706(2)(A) as not in accordance with the law, given that this decision was in open breach with AR 623-3.

**Claim IV: The ABCMR's refusal to correct the DA Form 1059 must be vacated as not in accordance with the law, as the dismissal of Plaintiff from the course was in violation of the binding Army guidance establishing the procedures for dismissal from the course.**

116.    Under *Accardi*, an agency must follow its own binding guidance. *See, Accardi*, 347 U.S. 260 *et seq.*

117.    Under *Catawaba County v. EPA*, 571 F.3d 20, 33-4 (D.C. Cir. 2009), guidance is only nonbinding when it satisfies all four of the criteria of (1) explicitly stating that it is not binding, (2) merely representing the agency's current views on a regulatory process, (3) only creating rebuttable presumptions, and (4) only clarifying existing statutory duties.

118.    The Department of Defense satisfied *none* of those conditions when it released the HT-JCOE Student Evaluation Plan ("SEP"), which clearly lays out in its first paragraph that it is intended to form the binding structure and procedures for the course. Exhibit X2, HT-JCOE Student Evaluation Plan at 2; *compare Catawba*, 571 F.3d at 33-4.

119.    Under *Accardi* and *Catawba*, the SEP thus was binding guidance on the Department of Defense. *See id.*; *see Accardi*, 347 U.S. 260 *et seq.*

120.    SEP ¶ 3(b) clearly establishes that Academic Probation is required prior to dismissal from the course. *See* Exhibit X2.

121.    In addition, SEP ¶ 3(c) establishes that poor performance under any standard or in any common skill will result with retraining and then retesting. *Id.*

122.    Plaintiff was never placed on Academic Probation, nor was he ever given any retraining.

123.    His dismissal from the course was thus in violation of binding guidance.

124.    The ABCMR's decision to uphold this dismissal was thus not in accordance with law and must be vacated under 5 U.S.C. § 706(2)(A).

**Claim V: The ABCMR's refusal find that Plaintiff being dismissed from the course on the basis of unevenly and erratically applied room intrusion tests was an injustice, despite injustice being clearly presented within the record, must be set aside under the Administrative Procedure Act as arbitrary and capricious.**

125.    Under *Code v. McCarthy*, 959 F.3d 406, 415 (D.C. Cir. 2020) the failure by a military corrections board to correct an injustice clearly presented in the record violated the board's statutory mandate under 10 U.S.C. § 1552 and must be set aside as arbitrary and capricious.

126.    Plaintiff argued within his application that the dismissal of Plaintiff based on a single, unevenly, applied room intrusion test, for which he had received zero retraining, was a clear injustice.

127.     As noted before, the DIA Inspector General substantiated that, not only had the room intrusion tests been unevenly, or not at all, applied to the students, the murder board decisions themselves were without any written evaluation standards or written record of the decision making process itself. *See* Exhibit X5 at 44, DIA IG 2013-400001 at 43.

128.    The report even recommended corrections which would have explicitly fixed the problems raised by the Plaintiff, alongside the previous report, which had substantiated the major security failings Plaintiff had raised, which had subsequently been shot down by ASOC leadership. *See id.*; *see also* Exhibit X5 at 18-19 (DIA IG 2011-500040 at 17-18).

129.    Given that even the DIA IG found that the process of the application of the tests, and the conducting of the murder boards, were deeply problematic, it's clear that Plaintiff had clearly presented injustice within the record when it came to his dismissal based on those same exercises.

130.    The alleged seventeen failures were only ever raised retroactively, as HT-JCOE tried to justify its prior decision when placed under scrutiny, despite the fact that ASOC leadership, at the time, clearly did not believe that he ever sufficiently struggled as to merit academic probation or even retraining.

131.    HT-JCOE cannot try to reconstruct a reason for why it had dismissed Plaintiff when it did not state that as a reason at the time, especially given that that reconstruction is based on

classified information which this Court cannot assess, and to which Plaintiff cannot review or respond.

132.    Given that injustice is clearly present within the record, this Court should thus find that the ABCMR's refusal to correct Plaintiff's records was arbitrary and capricious. *See Code*, 959 F.3d at 415.

## CONCLUSION

WHEREFORE, the Plaintiff respectfully requests that this Court issue an order:

      (a)    Vacating the ABCMR's decision in AR20190012413 as arbitrary, capricious, and unsupported by substantial evidence;

      (b)    Holding that the ABCMR's application of the "clear and convincing" evidentiary standard to Plaintiff's matter was contrary to law;

      (c)    Ordering the ABCMR to inform the Court as to whether it has been applying the "clear and convincing" standard as a matter of course, and for how long it has been doing so;

      (d)    Holding that the ABCMR's refusal to correct Plaintiff's records was contrary to law as a violation of Army regulation;

      (e)    Holding that the ABCMR's refusal to correct Plaintiff's records was contrary to law as a violation of binding Army guidance, via the SEP;

      (f)    Holding that the ABCMR's refusal to correct Plaintiff's records was arbitrary and capricious due to injustice being clearly present within the record.

      (g)    Ordering the ABCMR to correct Plaintiff's records to reflect the release requested in the underlying application, docket number AR20190012413.

      (h)    Granting all such other relief as the Court finds necessary and proper

Plaintiff also signals his intent to file for attorney's fees and costs under the Equal Access to Justice Act.

Dated: August 16, 2022                Respectfully submitted,

                                      */s/DavidP.Sheldon*

                                      David P. Sheldon (DC Bar # 446039)
                                      Law Offices of David P. Sheldon, P.L.L.C.
                                      100 M. St. SE, Suite 600
                                      Washington, DC 20003
                                        Tel: 202.546.9575
                                        *Attorney for Plaintiff*